85 So.2d 395

**The WESTERN GRAIN COMPANY CASES.**

6 Div. 374, 489, 490, 585, 491, 492, 584, 657, 658, 143, 144, 694, 966, 689, 892, 893.

Supreme Court of Alabama.

Feb. 3, 1955.

Rehearing Denied Oct. 13, 1955.

Further Rehearing Denied Feb. 10, 1956.

J. P. Mudd, Birmingham, for Western Grain Co.

Marguerite W. Mudd, Dimmis W. Riley, Eula W. Cross, Bethea McCall, J. P. Mudd, Jr., Edward W. Mudd, Robert H. Mudd and J. P. Mudd, pro se.

Spain, Gillon, Grooms & Young, Birmingham, and Rushton, Stakely & Johnston, Montgomery, for Western Grain Co.

Horace C. Wilkinson, pro se.

White, Bradley, Arant, All & Rose, Birmingham, for Edward Wilkinson, Jr., Elizabeth W. Lanier and Sterling S. Lanier, Jr.

Lange, Simpson, Robinson & Somerville, Birmingham, for Sterling S. Lanier, III, Grace Lanier Brewer and Elizabeth Lanier DeRamus.

Cabaniss & Johnston, Birmingham, for First National Bank of Birmingham.

PER CURIAM.

These cases pertain to a bitter family dispute in what has developed to be a struggle to gain control of Western Grain Company, a corporation.

Prior to October 9, 1953, the date of submission of the sixteen cases now being considered, there had been eleven appeals to this court involving various phases of the litigation. Written opinions appear in the following cases: Wilkinson v. McCall, 247 Ala. 225, 23 So.2d 577; Riley v. Wilkinson, 247 Ala. 231, 23 So.2d 582; Ex parte Riley, 247 Ala. 242, 23 So.2d 592; Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550; Riley v. Wilkinson, 247 Ala. 579, 25 So.2d 384, and Riley v. Bradley, 252 Ala. 282, 41 So.2d 641. Appeals in which no opinions were written are Wilkinson v. Wilkinson, 247 Ala. 702, 23 So.2d 601; Ex parte Riley, 247 Ala. 700, 23 So.2d 601; Mudd v. Wilkinson, 247 Ala. 699, 23 So.2d 602; Ex parte Mudd, 247 Ala. 699, 23 So.2d 601, and Ex parte Mudd, 247 Ala. 699, 23 So.2d 601.

These sixteen cases now before us are not the normal cases that are prosecuted to an appellate court. One of the parties describes the record as being of more than 15,000 pages, divided into 27 volumes, and the briefs as consisting of 3,500 pages, further stating that there have been "twelve years of controversy which have successively burdened nine trial judges, involved twenty lawyers and imposed thirty appellate proceedings on this court." (In addition to the eleven appeals already disposed of and the sixteen appeals now being consid-

ered, four new cases were submitted on November 17, 1954.) It is not practical that we attempt to handle these appeals in the usual manner. We propose to handle each case with a minimum of discussion. At the outset we quote a paragraph from the case of Shepherd v. Sartain, 185 Ala. 439, 460, 64 So. 57, 65, which we consider appropriate:

"To assert that we have compassed the enormous task here imposed upon us, involving as it does innumerable questions of fact as well as of law, without mistakes more or less numerous, would be an unbecoming assumption of judicial infallibility. That we have reached an approximately correct result we have, however, no reason for seriously doubting."

A comprehensive statement of facts leading up to this litigation appears in Wilkinson v. McCall, 247 Ala. 225, 23 So.2d 577, supra, and Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550, supra. Accordingly, we shall attempt to condense our statement here to a bare minimum consistent with readability and understandability.

In 1912 Edward Wilkinson, Sr., organized the Western Grain Company, an Alabama corporation, and was at all times the owner of a majority of the common stock. In 1921 Frank Nelson became the largest minority holder of common stock. In 1922 friction arose between the two and J. P. Mudd, Wilkinson's son-in-law, purchased Nelson's stock. Mudd became a director and attorney for the corporation shortly afterwards.

Edward Wilkinson, Sr., died on November 6, 1941, at the age of 77 years, leaving surviving him his widow, Grace H. Wilkinson, who is non compos mentis, and four children, viz.: Mrs. Marguerite W. Mudd, wife of J. P. Mudd, Mrs. Elizabeth W. Lanier, wife of Sterling S. Lanier, Jr., Mrs. Dimmis W. Riley, wife of E. W. Riley, and Edward Wilkinson, Jr. His estate consisted chiefly of 151 shares of common stock in Western Grain Company, which, by the terms of his will, were placed

in trust. By his will, Edward Wilkinson, Jr., and Mrs. Lanier were appointed joint executors and also as co-trustees for administering the 151 shares of stock.

During his life Edward Wilkinson, Sr., created five separate trusts for the benefit, respectively, of his wife and each of his four children. He named himself trustee in each of the trusts and named Edward Wilkinson, Jr., and Mrs. Lanier as successor co-trustees. The property in each of the trusts consisted only of shares of common stock in the Western Grain Company, divided as follows: Mrs. Grace Wilkinson, 30 shares; Mrs. Dimmis Riley, 30 shares; Mrs. Marguerite Mudd, 20 shares; Mrs. Elizabeth Lanier, 20 shares; and Edward Wilkinson, Jr., 20 shares; a total of 120 shares. At the time of his death there were outstanding 500 shares of common stock and 150 shares of preferred stock in the Western Grain Company.

On December 17, 1941, special meetings of the stockholders and directors of Western Grain Company were held. At the directors' meeting it was proposed to elect Edward Wilkinson, Jr., as president of the company. Mr. and Mrs. Mudd objected on the grounds that he was neither capable nor fit for the office. The voting resulted in the election of Edward Wilkinson, Jr., Edward Wilkinson, Jr., and Mrs. Lanier voted for Edward Wilkinson, Jr., their individual stock and also the 151 shares belonging to the estate and the 120 shares of trust stock. They were joined by Mr. Lanier and Bethea McCall. Mr. and Mrs. Mudd voted for Mr. McCall.

On December 22, 1941, Mr. and Mrs. J. P. Mudd and Mrs. Grace Wilkinson, by Mrs. Mudd as next friend, filed a bill in equity praying for the removal of Edward Wilkinson, Jr., as President of Western Grain Company, and the removal of Edward Wilkinson, Jr., and Mrs. Lanier as executors and trustees. This suit was given the circuit court number of 53010, the number also given to the administration of the estate of Edward Wilkinson, Sr., which had been removed to equity. The suit had several aspects: One, as a derivative stockholders' suit to correct alleged corporate mismanagement by the board of directors acting through a majority block composed of Mr. and Mrs. Lanier, Edward Wilkinson, Jr., and Bethea McCall; two, by Mrs. Mudd, as beneficiary under the trusts created by her father, against the trustees and executors for maladministration of the and executors for maladministration of the trusts. In this suit Mr. and Mrs. Mudd were represented by Judge Horace Wilkinson, and the respondents, Mr. and Mrs. Lanier and Edward Wilkinson, Jr., were represented both in their individual and representative capacities by Mr. White E. Gibson, who was also a stockholder in Western Grain Company. A claim was also filed by Mr. Mudd in behalf of the Company against the estate of Edward Wilkinson, Sr., for $148,000 arising out of alleged improper withdrawals prior to his death.

We understand from the evidence that when suit 53010 was instituted, and on May 25, 1942, prior to the meetings of the board of directors and stockholders on that date, the 650 shares of stock in the company were distributed and aligned as follows:

Majority

Mrs. Lanier
Mr. Lanier
Edward Wilkinson, Jr.
Mrs. Tillman

Bethea McCall
Mrs. Mary S. Wilkinson
White E. Gibson
The estate, controlled by
Edward Wilkinson, Jr., and
Mrs. Lanier as Executors
The 5 trusts, controlled by
the same parties as trustees
Total for majority

Minority

J. P. Mudd
Mrs. Mudd
Alabama By-Products Co.
Mrs. Fowlkes
Mrs. Caldwell
Total for minority
Grand total issued

| Common | Preferred |
|---|---|
| 20 | |
| 5 · | |
| 8 | |
| | 25 (later purchased by Edward Wilkinson, Jr.) |
| 10 | 10 |
| 1 | |
| 1 | |
| 151 | |
| 120 | |
| 316 | 35 = 351 |
| 134 | 79 |
| 50 | 1 |
| | 25 (purchased by Mr. Mudd) |
| | 5 (purchased by Mr. Mudd) |
| | 5 (purchased by Mr. Mudd) |
| 184 | 115 = 299 |
| 500 | 150 = 650 |

Various negotiations were conducted between Judge Wilkinson and Mr. Gibson and on May 25, 1942, an agreement of settlement was reached, a meeting of the directors and stockholders held to ratify the settlement and the cause was submitted to Judge Bailes. Because of their importance, the note of submission, the minute entry and the decree will be set out by the reporter.

It will be noted that paragraph 5 of the decree provided for the issuance to Mr. Mudd of 150 shares of preferred stock.

There was a slight calm in events until early July, 1942, when Mr. Mudd made known his contention that the 150 shares of preferred stock voted. It is apparent from the table set out above that Mr. and Mrs. Mudd then owned a majority of the 800 shares authorized and outstanding.

As will be noted from paragraph 4 of the decree, Mrs. Lanier's resignation as co-executor of her father's will and co-trustee of the testamentary trust and the five living trusts was accepted and she was relieved from acting as such. The circuit court approached a Bank and several in-dividuals in an effort to secure a suitable person to replace Mrs. Lanier as such co-executor and co-trustee. After several declinations to serve, all parties agreed on Mr. Bethea McCall, the new president and general manager of the company. When Mr. McCall learned that Mr. Mudd was asserting his claim that the preferred stock voted, he petitioned the court for and received authority to employ independent counsel to advise him as to his actions as co-executor and co-trustee, especially as to how the stock he represented should be voted. He employed Mr. W. H. Sadler. After an investigation, Mr. Sadler "advised Mr. McCall that the preferred stock had voting privileges and to vote for the directors nominated by Mr. Mudd" at stockholders' meetings. Mr. McCall followed this advice and thereafter became aligned with the Mudd group.

In the fall of 1942, the firm of Lange, Simpson, Brantley and Robinson was employed by Mr. Lanier to file a bill in the nature of a bill of review on behalf of Mr. and Mrs. Lanier's children against Mr. and Mrs. Lanier, Edward Wilkinson, Jr., Mr. and Mrs. Mudd, Mrs. Riley, the guardian of Mrs. Grace H. Wilkinson, Mrs. Eula W. Cross, Mr. McCall, Western Grain Company, the executors of the Estate of Edward Wilkinson, Sr., and the trustees, to set aside the decree of May 25, 1942. The suit by the Lanier children, filed December 16, 1942, is Circuit Court No. 55708 and to identify the various appeals hereinafter considered, we designate, after the division number, the circuit court number of 53010 or 55708 to indicate whether the administration (53010) or the setting aside of the May 25th decree (55708) is the primary consideration in the particular case.

6 Div. 374 (55708)

The decree of the circuit court in equity on demurrer to the bill was considered in Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550, supra, and many points presented by the bill were there treated. Mr. and Mrs. Lanier and Edward Wilkinson, Jr., filed answers which they made cross-bills, and in which they adopted and added to the aver-

ments of complainants' bill against themselves and adopted the prayers in complainants' bill. Testimony was taken in this case from 1943 to 1951 and the appeal and cross appeal come from the decree of the circuit court dated November 20, 1951. While other claims were asserted and adjudicated, the principal questions on which the case turns are whether Mr. Mudd, as a director and stockholder of the corporation, was obligated to inform the other directors and stockholders, including Mr. and Mrs. Lanier and Edward Wilkinson, Jr., that, at the settlement and when the decree of May 25, 1942, was rendered, he held an opinion that the 150 shares of preferred stock which were issued to him as part of the settlement, were voting stock, and whether the said decree of May 25, 1942, in 53010 was to be treated as a consent decree or as a judicial proceeding and as such res judicata. (We are aware that the preceding sentence is probably an oversimplification of the issues, but it should suffice.)

The trial court made certain pertinent statements and findings in the decree of November 20, 1951, with which we agree, to wit:

(1) "Courts look with favor upon settlements of litigation especially within families and between stockholders of closely held corporations."

(2) "The court is firmly of the opinion that they (the claims of Mr. and Mrs. Mudd in the original suit (53010)) afforded an ample consideration for a compromise and settlement, insofar as the corporation, its stockholders and the estate of Edward Wilkinson, Sr., deceased, were concerned."

(3) "The court is therefore of the opinion that the settlement was valid and binding upon all parties unless the complaining parties are entitled to relief because of the failure of Mr. Mudd to disclose to them at the time of settlement or prior thereto, the fact that the preferred stock of the Western Grain Company had general voting powers."

(4) "The Court is clearly of the opinion that, at the time of the settlement, neither Edward Wilkinson, Jr., nor Mr. and Mrs. Lanier knew that the preferred stock of the corporation had voting powers either as to the usual voting of the shares or with regard to the charter amendment requiring approval by a majority of the stockholders for the redemption of the preferred stock."

(5) "The Court is further clearly of the opinion that neither of these parties would have voted as directors or as stockholders to approve the settlement had they known of the voting power of the preferred stock of the corporation."

(6) "The Court is further clearly of the opinion that, at the time of the settlement, Mr. Mudd was of the opinion that the preferred stock of the corporation had general voting powers."

(7) "Therefore, the decisive questions in this case are:

"(a) Whether there is clear and convincing evidence that Mr. Mudd knew of the belief on the part of the Wilkinson-Lanier Group that the preferred stock did not have voting powers and was, therefore, under a duty to make a disclosure of his knowledge or belief to the contrary; or

"(b) Whether independently of such knowledge on his part of their mistake, he was put on notice as to their probable mistake and was, therefore, under a duty as a director to make a disclosure of his knowledge or belief as to the voting power of said stock."

(8) "The evidence is without dispute that the Lanier-Wilkinson Group discussed with two or more of their attorneys the question as to whether the preferred stock had voting powers and were advised by one of their attorneys that it did not have such powers. Another attorney advised them to proceed with the settlement if the preferred stock did not vote. One of the attorneys advised them the likely reason for Mr. Mudd's wanting a hundred and fifty (150) shares of preferred stock was that it would give him an eight (8) per cent investment for a minimum of five (5) years. How-

ever, the record was available to the said attorneys of the fact of the voting power of the preferred stock could have been ascertained by an examination of the charter of the corporation, and a copy of the charter was in the files of one of the attorneys. The attorney, who advised them that the preferred stock did not vote, and who at the time was also the attorney and counsel of the Western Grain Company, based his advice on a statement made to him by Mr. Edward Wilkinson, Sr., prior to his death. The above recitations leave no reason for doubt that the Edward Wilkinson, Jr., Group was acting on a mistake as to the voting power of the preferred stock. However, at no time during the negotiations or on the day of the settlement was Mr. Mudd or his attorney advised that the adversary parties were advising with their attorneys on the question of whether the preferred stock had voting rights. Neither Mr. Mudd nor his attorney were asked to express an opinion or belief as to the voting rights of the preferred stock. No request was made to Mr. Mudd or his attorney that the proposed settlement include a stipulation that the preferred stock did not have voting rights."

(9) "The controversy between the parties was bitter; they were dealing at arm's length and were not even on speaking terms."

We are unable to agree with all of the following findings:

(1) "The Court is, therefore, of the opinion that there was a duty imposed upon Mr. Mudd to have disclosed to the directors considering the settlement, particularly in a transaction between himself and the corporation of which he was a director, that he was of the opinion that the preferred stock had general voting powers. The Court feels that Mr. Mudd gave no consideration to this being his duty, because of the bitterness between the parties and his impression of the fact that they were dealing at arm's length, and because of the further fact that the said Wilkinson-Lanier Group were represented during the negotiations and, at the time of the settlement, by able counsel. For these reasons the Court

is of the opinion that Mr. Mudd was not guilty of a conscious concealing or suppression or of a conscious breach of duty to disclose his opinion as to the voting rights of the preferred stock to the adversary parties or their counsel. However, the Court is further of the opinion that these facts did not relieve him of the duty to correct the erroneous impressions which might have been gained from the pleadings and affidavits filed in the cause number 53010 relating to the control of the corporation and indicating that the preferred stock did not have voting powers, when that became a matter of primary importance. The Court is further of the opinion that the said facts did not relieve Mr. Mudd of the duty to make such disclosure to the other directors in view of the fact that, as a director, he was under a fiduciary relationship to the corporation, its directors and stockholders."

(2) "Therefore, the Court is of the opinion that the complainants and cross complainants are entitled to the relief prayed for and that, considering all the facts and circumstances leading up to, and at the time of the settlement, it would be inequitable for the settlement and the decree thereon to be upheld unless the said complainants are entitled to assert an estoppel against the voting powers of the one hundred and fifty (150) shares of preferred stock issued to Mr. Mudd and against the legal right of Mr. Mudd or his assigns to vote on the redemption of the preferred stock any of said preferred stock owned or controlled by him. Upon due consideration, the Court is of the opinion that the settlement and decree thereon should be ratified and confirmed by the Court, subject to the said estoppels."

While not attempting to give all the reasons for our disagreement with the trial court, we cite a few facts or circumstances which appear to be undisputed:

1. Edward Wilkinson, Jr., a fellow director and stockholder, testified that he did not rely on Mr. Mudd for advice and was not speaking to him during the negotiations, and he thought Mr. Mudd wanted.

to acquire control of the company prior to May 25, 1942.

2. Mrs. Lanier, another director and stockholder, testified that she did not trust Mr. Mudd's integrity; that in the negotiations of the May 25th settlement, she did not trust or rely on him.

3. During the negotiations and at the time of the settlement, the Lanier-Wilkinson Group controlled a majority of the 650 shares outstanding and were in control of the company.

4. Mr. Gibson went to Hopkinsville, Kentucky, to confer with the Laniers early in April, 1942, about the proposed settlement. Mrs. Lanier testified that at that time Mr. Gibson informed her about the proposed issuance of the preferred stock to Mr. Mudd. She told Mr. Gibson, "There is some reason Joe wants that stock. Why is it?" She said Mr. Gibson replied, "It is not voting stock."

5. Edward Wilkinson, Jr., while testifying about his conference with Mr. Gibson and after Mr. Gibson had returned from Kentucky, was asked: "Q. Did he tell you that Mrs. Lanier said in substance I hate to make a settlement like this because it seems perfectly terrible to confer on Mr. Mudd control of the company for having caused all this disturbance? A. That is my recollection—something to that effect. I think it is pretty close to what he told me."

6. The first sentence of the 18th paragraph of a sworn petition, as amended, filed on behalf of Edward Wilkinson, Jr., verified by him and signed by Messrs. All and Bradley as attorneys, reads:

"On, to-wit, May 25, 1942, the petitioner and his sister, Mrs. Lanier, employed the law firm of Bradley, Baldwin, All & White to advise them as executors of the Will of the decedent, as trustees thereunder and as trustees of the living trusts, with reference to the advisability of entering into the settlement which was then in course of discussion between them in said capacities and others interested in the settlement, which settlement is involved in said cause #55708."

7. Edward Wilkinson, Jr., as president of the corporation, and Mr. Gibson, as his and its attorney, had all the corporate records at their disposal and under their possession or control prior to and on May 25, 1942.

8. On Sunday afternoon, May 24th, the day before the scheduled settlement was to be effected, the Laniers and Edward Wilkinson, Jr., decided to consult Mr. White of Bradley, Baldwin, All & White the next day as to the advisability of entering upon the proposed settlement.

9. Mr. White had assisted in drawing an amendment to the charter of Western Grain Company in 1915, which provided for the issuance of the 300 shares of preferred stock.

10. The corporate charter and the amendment were recorded in the Probate Office of Jefferson County and there was no restriction as to the voting power of preferred stock.

11. Code 1940, Title 10, Section 38, governed and is as follows:

"Unless otherwise provided in the certificate of incorporation or any amendment thereof or joint agreement of merger or consolidation, stockholders shall be entitled to one vote for each share of such stock owned by them and may vote either in person or by proxy."

12. Edward Wilkinson, Jr., and Mrs. Lanier went over the terms of settlement with Mr. White in his office and then invited him to sit in the conference with them and Mr. Gibson, who again went over the proposed settlement with Mr. White.

13. Mr. White testified: "I asked whether the preferred stock was voting stock. Mr. Gibson said, 'No.' I made no investigation at all. * * * It was pretty clear if the preferred stock voted the control would pass from where Mr. Wilkinson had put it under his will and under the

trusts. That is the principal reason I asked the question. * * * I said I thought under the circumstances, it was a good settlement, but I was relying entirely on Mr. Gibson for all statements of facts and of law. * * * I think I said, 'Well, it is a family matter, and I think the best thing to do with those things always is to settle them if they can be settled on the right basis.' "

14. The question of whether the preferred stock voted was considered and discussed on May 25, 1942, at a meeting in Mr. Gibson's office at which Mr. Gibson and Mr. White, Mr. and Mrs. Lanier and Edward Wilkinson, Jr., were present.

15. At the same meeting these parties considered and approved, and the directors and stockholders at meetings held on the same day voted, an amendment of the charter by adding paragraph 11–A, proposed by Mr. Mudd's attorney as a part of the settlement, which reads as follows:

"(11–A) The preferred stock of the corporation, now or hereafter issued, shall not be called or redeemed until the stockholders of the corporation shall, by resolution duly adopted, require such action to be taken, and no such action shall be taken until after the expiration of five years from this day."

16. At this stockholders' meeting, attended by all the directors who were also stockholders, Mr. Gibson presented a draft of the proposed decree which had been prepared to carry into effect the settlement which had been authorized by the Board of Directors and on motion of Mr. Lanier and a second by Edward Wilkinson, Jr., the motion was unanimously adopted.

17. In arguing a feature of case 53010 in January, 1942, Mr. Gibson had argued that Mr. Mudd was trying to get control of the company. He knew at that time that Mr. Mudd had previously tried to purchase the 25 shares of preferred stock owned by Alabama By-Products Co. This fact had been known by Edward Wilkinson, Sr., and was known by Edward Wilkinson, Jr.

18. Mr. Gibson and Judge Horace Wilkinson never discussed the question of whether the preferred stock voted until after May 25, 1942.

19. They did discuss the matter in July or August, 1942, when Mr. Gibson learned of Mr. Mudd's opinion that it did have voting power. At that time Judge Wilkinson told Mr. Gibson, "If you say I have in any way in the world misrepresented this situation to you, I will go to the court house and have the decree (that of May 25, 1942) set aside.", and Mr. Gibson's reply was that Judge Wilkinson had not misrepresented anything to him.

20. When this cause was submitted here on October 9, 1953, it was recognized by the parties that preferred stock in Western Grain Co. has voting power. But this was not conceded in May, 1942, or for several years thereafter. The attorney who verified the original bill in 55708 on December 14, 1942, took the contrary position, because in the bill we find, "and complainants further aver that neither this preferred stock (the 150 shares issued to Mr. Mudd in the compromise) *nor that previously outstanding* is voting stock of said corporation." (Emphasis supplied). Mr. Gibson, testifying in March, 1946, said the question of whether the preferred stock voted was "still debatable and doubtful" in his mind and that prior to May 26, 1942, he did not know it had voting power. When Mr. Sadler advised Mr. McCall that the preferred stock did vote, it was contended in 1945 in this court that Mr. Sadler was not entitled to an attorney's fee because it was "insisted that Mr. Sadler gave erroneous advice as to the voting power of the preferred stock." Wilkinson v. McCall, 247 Ala. 225, 23 So.2d 577, 579, supra. The argument that none of the outstanding preferred stock voted was made by two law firms in the case of Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550, supra. However, by amendment filed in June, 1946, the complainants struck the allegation that the preferred stock did not vote and alleged in an amendment that "preferred stock of the company is, and has, since original issue, always been entitled to one vote for each share thereof, in the same manner, to the

same extent and for all of the same purposes as the common stock of the company."

21. In other paragraphs of this amendment it was alleged that Edward Wilkinson, Sr., knew, or was advised of the fact, in 1922, that the preferred stock voted and that he, Mr. Lanier and Mr. Mudd formed a plan whereby Mr. Lanier, for Mrs. Lanier, and Mr. Mudd purchased 60 shares of common and preferred stock, thereby enabling them to pool their holdings with Mr. Wilkinson, Sr., and maintain him in control of the company.

22. The minutes of the company disclose that both prior to and subsequent to Mr. Mudd's connection with the company, the preferred stock voted at stockholders' meetings.

23. On October 22, 1942, Mr. White wrote to Mrs. Tillman concerning a proxy from her to him to vote her preferred stock at a stockholders' meeting. This was some two months before the filing of suit 55708 in which the position was taken that the preferred stock did not vote.

24. The actual certificate representing the 150 shares of preferred stock issued to Mr. Mudd in the settlement had no restrictions as to voting on its face and was executed in part by Mr. Gibson.

25. Mr. Gibson did not "examine the minute book of the Western Grain Company or the records of the Probate Judge's office or any other source of information to find out what were the provisions appertaining to the preferred stock of the Western Grain Company," nor had he ever seen the original charter or the amendments thereto before May 26, 1942.

Appellants, the Mudd group, insist that the decree of May 25, 1942, was rendered by an equity court in the exercise of its judicial powers and discretion for the reasons that the judicial records thereof so indicate, and that it covered, among other matters, the settlement of stockholders' derivative suits, a compromise of which must be approved by the court under Equity Rule 31 (b), Code 1940, Tit. 7 Appendix, the issuance of injunctions, the approval of the resignation of a trustee and executor, the approval of an executor's conduct, rights of a non compos mentis and rights of contingent beneficiaries, some of whom were minors; and that, being a judicial decree as distinguished from a mere consent decree, it effectively adjudicated the rights of all parties in the case at bar and, as such, was res judicata and is not subject to review or modification in this action (fraud in its procurement not being alleged and proved). Among the many cases supportive of this proposition are A.B.C. Truck Lines v. Kenemer, 247 Ala. 543, 25 So.2d 511; Cowley v. Farrow, 193 Ala. 381, 69 So. 114, and Adler v. Van Kirk Land & Construction Co., 114 Ala. 551, 21 So. 490, 62 Am.St.Rep. 133. On the other hand, the Wilkinson-Lanier group, cross-appellants, take the position that Mr. Mudd, being a director of Western Grain Company, was in a fiduciary relation to the other directors and stockholders, and for that reason was under a duty to disclose to them his knowledge or opinion that the preferred stock had voting power; and that his failure to so disclose calls for setting aside the decree of May 25, 1942, because that decree, being in consummation of a settlement agreement, was a consent decree which partakes of the nature of a contract and is not, strictly speaking, res judicata since such decree is no more solemn than a solemn contract entered into between contracting parties. Brasher v. First Nat. Bank of Birmingham, 232 Ala. 340, 168 So. 42.

We see no necessity of deciding whether or not that decree was a consent decree. Our view is that, although it may be said as a general proposition that a director stands in a fiduciary relation to the other directors and stockholders, Blount County Bank v. Harvey, 215 Ala. 566, 112 So. 139; Blythe v. Enslen, 203 Ala. 692, 695, 85 So. 1; 3 Fletcher Cyclopedia Corporations, Sect. 838, p. 173, under the particular facts and circumstances of this case, Mr. Mudd, at the time of the settlement and the rendering of the decree of May 25, 1942, was not in such a fiduciary relationship as to impose on him the duty of disclosing his unsolicited

opinion with respect to the voting power of the preferred stock. The general rule that a director occupies a fiduciary relation is not to be taken as prohibiting him from having any personal dealings with the corporation and the other directors and stockholders. The duty imposed on the director in such dealings is necessarily defined by, and dependent upon, the particular facts and circumstances involved. Each case must be considered separately on the basis of its own facts. As stated in Paddock v. Siemoneit, 147 Tex. 571, 576, 577, 218 S.W. 2d 428, 431, 7 A.L.R.2d 1062:

"The first question for determination is whether C. J. Siemoneit was guilty of a breach of fiduciary duty under these facts. Undoubtedly, as a director and the managing officer of the corporation, Siemoneit occupied the position of a fiduciary toward the company. Tenison v. Patton, 95 Tex. 284, 67 S.W. 92; 3 Hildebrand, Texas Corporations (1942), Secs. 681, 692; 3 Fletcher, Cyclopedia of the Law of Private Corporations (1947), Secs. 838, 850; Ballantine, Corporations (1946), Sec. 66. Nevertheless, the texts cited point out that officers and directors of corporations are not strictly trustees, and that their duties and liabilities are not necessarily identical with those of other fiduciaries. The character and consequences of the acts of an officer or a director have apparently been determined on the basis of the facts of each case. Acts which might well be considered breaches of trust as to other fiduciaries have not always been so regarded in cases of corporate officers or directors."

We here observe that we have not found any case which we feel could be cited as controlling authority in the case now before us. We proceed to refer to some of the authorities which we consider applicable.

In Epstein v. United States, 6 Cir., 174 F.2d 754, 764, it is said:

"* * * There can be no doubt that directors are fiduciaries. 'Their powers are powers in trust. * * * Their dealings * * * are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director * * * not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. * * * *The essence of the test is whether or not under all of the circumstances the transaction carries the earmarks of an arm's length bargain.'* Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 245, 84 L.Ed. 281. * * *" [Emphasis supplied.]

In Farrell v. Farrell, 243 Ala. 389, 10 So.2d 153, 156, where it was held that "Husband and wife do not stand in fiduciary relationship in divorce proceedings, one against the other", the opinion states:

"' * * * "It is not sufficient merely to raise a suspicion or to show what is sometimes called 'constructive fraud,' but there must be a false and fraudulent representation, or a fraudulent affirmative act, or a fraudulent concealment of a fact, for the purpose of obtaining an undue and an unjust advantage of the other party, and procuring an unjust and unconscionable judgment. It is not practicable nor possible to formulate a rule on this subject which will be sufficient to solve all cases; but, where fraudulent concealment of a fact is relied upon for the purpose of impeaching and setting aside a judgment regularly obtained, it must be an intentional concealment of a material and controlling fact, for the purpose of misleading and taking an undue advantage of the opposite party." The books abound with cases enunciating and illustrating this doctrine. United States v. Throckmorton, 98 U.S. 61 (25 L.Ed. 93); Randall v. Payne, 1 Tenn.Ch. (137), 143; Gifford

v. Thorn, 9 N.J.Eq. 702; Dringer v. (Receiver), 42 N.J.Eq. 573, 8 A. 811; Watts v. Frazer, 80 Ala. (186), 188; Adler v. (Van Kirk Land &) Construction Co. (114 Ala. 551), 21 So. 490 (62 Am.St.Rep. 133). * * *

" 'An elementary principle is that fraud is not to be presumed when parties do not stand in fiduciary relations, and will not be imputed when the facts and circumstances from which it is supposed to arise are fairly and reasonably consistent with honesty of intention. 1 Story Eq. Jur. § 190; 1 Brick.Dig. 662, § 323; Thames v. Rembert's Adm'r, 63 Ala. 561; Harrell v. Mitchell, 61 Ala. 270; Pollak v. Searcy, 84 Ala. 259, 4 So. 137.' See, also, Wright v. Wright, 230 Ala. 35, 159 So. 220.

* * * * * *

"It is also elementary that one who seeks relief from a judgment or decree of a court of competent jurisdiction must aver and prove that he was himself free from fault or negligence in suffering the judgment or decree to be entered. Evans v. Wilhite et al., 167 Ala. 587, 52 So. 845; Wright v. Wright, supra."

In Sullivan v. Pierce, 5 Cir., 125 F. 104, it was held that the evidence did not entitle complainant to a recission of a sale by him to defendant of his stock in a corporation of which they were practically the only stockholders, on the ground of false and fraudulent representations made by defendant, who was the active manager of the business, it being shown that complainant was the minority stockholder; that the relations of personal friendship and confidence which for many years existed between the parties had been broken some time before the sale, making complainant desirous of terminating their business connection; and that in making the sale he did not act in reliance on any statements or representations made by defendant, but on his own independent knowledge and judgment, and received a price not greatly below the actual value of his interest in the property at the time.

In Colton v. Stanford, 82 Cal. 351, 23 P. 16, 19, 16 Am.St.Rep. 137, the court said:

"We have been unable to find a case in which a lump agreement of compromise, entered into by surviving partners and the representative of a deceased partner, or by a trustee and *cestui que trust,*—the latter acting by the advice of experts and able counsel, and renouncing all confidence in the trustees,—after full, fair, and honest investigation, has been rescinded because of actual and unintentional inaccuracies discovered subsequent to the execution of the agreement; nor do we know of any universal rule of equity, or any provision of our Code, tending to establish the proposition that from the mere fact of a prior existing fiduciary relationship everything in the absence of proof must be presumed against the trustee who has entered into a contract with his *cestui que trust,* regardless of the question whether confidence has, in fact, been reposed and abused. Of course, in all trust relations the existence of confidence will be presumed, and, if it appear that any advantage has come to the trustee in dealing with his *cestui que trust,* the burden will be thrown upon him to show that confidence was not in fact abused. But it has always been held, as we understand it, that this presumption might be overcome by proof of the fact that confidence had not been abused, and that the beneficiary acted, not upon any reliance or confidence placed in the trustee, but upon the advice of an independent, professional, disinterested, and competent adviser."

In 5 Williston on Contracts, p. 4332, § 1543, it is said:

"In the first place there must be excluded from consideration mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk. With respect to any matter

not made a basic assumption of the contract the parties take their chances. Thus, where a compromise is made, the fact that one or both parties were under a mistake in regard to the claim which was the subject of compromise affords no ground for relief."

■ Two of our cases are cited in support of the foregoing statement, viz.: Carlisle v. Barker, 57 Ala. 267, and Troy v. Bland, 58 Ala. 197. In the latter case the authorities with respect to settlements and compromises are reviewed by Stone, J., and one statement cited with approval is, "When a compromise of a doubtful right is fairly made between the parties, whether the uncertainty rests upon a doubt of fact or a doubt in point of law, if both parties are in the same ignorance, the compromise is equally binding, and cannot be affected by any subsequent investigation and result."

■ We quote from 12 Am.Jur., Contracts, § 132: "Where the parties are conscious that the existence of particular facts is doubtful and make their agreement on this assumption, the nonexistence of such facts does not affect the validity of the agreement, the risk of their existence being taken by the parties". Sears v. Grand Lodge A. O. U. W., 163 N.Y. 374, 57 N.E. 618, 50 L.R.A. 204, is there cited as holding that when parties have entered into a contract based upon certain or contingent events purposely as a compromise of doubtful claims arising from them, and there is an absence of bad faith, violation of confidence, misrepresentation, or concealment, if the facts upon which such agreement was founded or the event of the agreement itself, turn out very differently from what was expected or anticipated, this error, miscalculation or disappointment is not such a mistake as entitles the disappointed party to any relief, either by way of canceling the contract and rescinding the transaction or as a defense to a suit brought for its enforcement.

■ "A party to a lawsuit is not bound to disclose to his adversary facts which tend to defeat or weaken his own right of recovery, and he commits no fraud by remaining silent." 23 Am.Jur., Fraud and Deceit, Sect. 92.

See Lovell v. Smith, 232 Ala. 626, 169 So. 280, where it was held that the fact that the directors of a corporation had purchased the controlling interest in the corporation did not impose on them the duty to inform a prospective purchaser of stock of such fact when no information concerning such purchases was *concealed* or *sought*. [Emphasis supplied.]

■ We said in Mudd v. Lanier, 247 Ala. 363, 377, 24 So.2d 550, 562, in dealing with this case on demurrer: "But our cases seem to hold that when both parties are intelligent and fully capable of taking care of themselves and dealing at arms' length, with no confidential relations, that no duty to disclose exists when information is not requested, and that mere silence is then not a fraud. There must be active concealment or misrepresentation"; and, "If there was a fraudulent concealment which induced the mistake, relief is available, whether it is called a 'fraud' or a 'mistake'. But in the absence of such concealment or 'other inequitable conduct' (not here alleged), relief is not available in either theory."

■ In Bunel v. O'Day, C.C., 125 F. 303, it was held that a compromise of a suit, if free from fraud, no matter how unjust the defendant may have regarded the charge, or what different result subsequent developments might probably produce, it should stand. The value consists in the release from an uncertain position, with its anxieties, and from inevitable expenses and trouble and such compromises are especially favored when of the nature of family settlements.

■ As to duty of directors of a corporation to inform themselves as to company records, we find this statement in 3 Fletcher, Cyclopedia Corporations, Section 1060, page 597: "So far as the powers of the corporation, and the powers and

**164**

duties of the officers, are prescribed by statute or charter or by-law, knowledge is imputed to the officer. As to this there is no question."

 This court said in New Orleans & Ala. Coal & Mining Co. v. Musgrove, 90 Ala. 428, 7 So. 747, 748:

"* * * Essential elements of misrepresentation, to be rendered available to rescind a contract, are that the party to whom it is made must be justified in relying, and must rely, upon the representation, and it must be an immediate cause of his entering into the contract. If he did not rely upon it, or was not misled by it, or if it was a fact equally open to the inquiries of both parties, and nothing done to prevent or obstruct or lull inquiry, the court will not interfere to grant relief. Crown v. Carriger, 66 Ala. 590. In Slaughter v. Gerson, 13 Wall. 379 [20 L.Ed. 627], it was ruled, where the means of knowledge are at hand, and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations; and that the same rule obtains when the complaining party does not rely upon the representations, but seeks means of verification of the statements from other sources, and acts upon the information thus obtained. * * *"

And Anderson, J., speaking for the court in Graybill v. Drennen, 150 Ala. 227, 231, 43 So. 568, 569, said: "* * * if the representation related to a matter equally open to the inspection or inquiries of both parties, or if the purchaser did not in fact rely on it, but sought and relied on other means of information, or if he negligently failed to use the means or opportunities in his power to ascertain the facts, relief will not be granted."

 We repeated in Hinson v. Byrd, 259 Ala. 459, 463, 66 So.2d 736, 739, "the rule of long standing that a pure mistake of law is not an adequate ground for relief in equity."

 On the proposition of estoppel we note the following from Pattillo v. Tucker, 216 Ala. 572, 113 So. 1, 3:

"* * * But it must also be borne in mind that a party who invokes an estoppel must have in good faith been ignorant of the true facts at the time the representation is made to him and at the time he acted thereon, and he must show that he acted with diligence to learn the truth. 2 Pom. Eq. (3d Ed.) § 810; 10 R.C.L. 696.

"'Where, therefore, one with convenient opportunity to ascertain the real facts by the exercise of reasonable diligence fails to do so, he will not be permitted to defeat another's just rights by urging an equitable estoppel based upon his having acted to his disadvantage in reliance upon the other's innocently mistaken representation regarding the facts.' 10 R.C.L. 696.

"'If he knew, or under all the circumstances ought to have known the facts, the estoppel, even if the representation was made on oath, falls to the ground.' Bigelow on Estoppel (5th Ed.) 627."

 And in Cosby v. Moore, 259 Ala. 41, 47, 65 So.2d 178, 182, we said:

"'An estoppel cannot exist where the knowledge of both parties is equal, and nothing is done by the one to mislead the other.' (That refers to an equitable estoppel.) Webb v. City of Demopolis, supra (95 Ala. 116, 13 So. [289] 297 [21 L.R.A. 62]). 'Its usual presentation is, when one person by his words, acts, conduct, or silence, induces another, on the faith thereof, to pledge his credit, incur a liability, or part with something valuable' * * *. 'It rests at last, for its vindication, on the manifest idea, that to allow such representation to be gainsaid, would be a fraud on him who

had thus acted, believing it to be true.' Leinkauff v. Munter, 76 Ala. 194, 198. It has been expressed in many different forms, but the foregoing fairly embraces all its elements. 31 C.J.S., Estoppel, § 66, p. 254, et seq.; Hinds v. Federal Land Bank, 237 Ala. 218, 186 So. 153."

■■■ The controversy in this case is largely between the Laniers and Edward Wilkinson, Jr., on one hand, and Mr. and Mrs. Mudd on the other. We again note that they were not on speaking terms and negotiations had to be transacted through their attorneys. Neither the Laniers nor Edward Wilkinson, Jr., trusted or relied in the slightest on Mr. Mudd. They were advised by able counsel both prior to and on the day of settlement. The actual question of the voting power of the preferred stock was considered. Mr. White's very statement that he considered it a good settlement *if* the preferred stock did not vote, shows a doubt or uncertainty. Edward Wilkinson, Jr., as President and Director, and Mr. and Mrs. Lanier, as directors, representing the controlling faction of the corporation, had, as such officers, access to all the corporate records. It was Mr. Gibson's opinion that it did not vote; it evidently was the opinion of Mr. Simpson and Mr. White several months later that it did not vote; it evidently was the opinion of Mr. White's partners two years later that it did not vote. It was the opinion of their adversary, Mr. Mudd, that it did vote. Under the circumstances of this case we can see no breach of any fiduciary or confidential relationship on the part of Mr. Mudd. After the Laniers and Edward Wilkinson, Jr., had conferred with their attorneys they and Mr. Gibson met with Mr. and Mrs. Mudd at the stockholders' meeting. If they had not been satisfied with the question of the voting power of the stock, or had not been willing to take the risk, they could have inquired of Mr. Mudd or his attorney as to Mr. Mudd's opinion. They were all present face to face and voting as directors and stockholders on whether the settlement should be ratified. We are unable to assert that there was any active or intentional concealment, any mis-

leading act or word on which reliance was placed, any abuse of confidence, any refusal to give or concealment of any information sought, or any greater opportunity to know the present facts on the part of Mr. Mudd or his attorney in their dealings in the compromise. On the other hand the knowledge of the voting power of the preferred stock would have to be imputed to the president and the Laniers as directors if the question were not one purely of law. They placed no reliance on Mr. Mudd's opinion or representation, nor did they act upon it, but upon the advice of admittedly competent, independent, professional advisers, all of whom at some time prior to the settlement, had been connected with the corporate affairs in a legal capacity.

■■■ From the foregoing it seems clear to us that the status of the settlement on which the decree in No. 55708 was rested presented no more than a mistake, pure and simple, on the part of the Wilkinson-Lanier group; in no way concurred or participated in by the Mudd group. Equity has never relieved the complaining party against the results of such mistake. Hinson v. Byrd, supra; Sellers v. Manasco, 247 Ala. 445, 25 So.2d 21; Venable v. Turner, 236 Ala. 483, 183 So. 644.

We mention one matter here that is pertinent, not only to this case, but to others which we are considering in this series of appeals.

In December, 1941, Western Grain Company was in debt and concededly was a small business. The direction of the corporation from shortly after the May 25, 1942, decree has been in the board of directors named by a combination of stock owned or controlled by Mr. and Mrs. Mudd and Mr. McCall, and management has been under Mr. McCall. In spite of the unprecedented and bitter litigation between the owners, constant hearings on applications for injunctions, supersedeas bonds and unfavorable publicity, the financial success of the company has been little short of fantastic. In Wilkinson v. McCall, supra, we noted [247 Ala. 225, 23 So.2d 579]: "Under the management of Bethea McCall

the business of the company increased from four million dollars a year to a volume of thirteen million dollars a year in 1943 and 1944", and further noted that on February 3, 1944, the collector of Internal Revenue sold thirty-four shares of stock on the basis of $1,480 per share. The two bidders for this stock were Mrs. Lanier and Mr. Mudd, persons who were more interested in acquiring it than a third party. We quote figures from appellants' brief which are not contested as we understand it. The average net profits after taxes for the years 1939 to 1942, inclusive, were approximately $71,000. Beginning in 1943 and ending with 1953, the total net profits after income taxes approximated $4,276,000. Net profits after income taxes in 1942 were $67,000, in 1953 $595,000. In 1947 the Wilkinson-Lanier group refused an offer of $5,000 per share and during the last ten years some $2,600 per share has been paid in dividends, and the volume of business had increased to approximately $25,000,000 in 1952.

It admits of little argument that the settlement of May 25, 1942, was very beneficial to the non compos mentis, to the estate, to the trusts and to all the parties concerned in this litigation.

It is our considered opinion, based on the foregoing and many other phases of the evidence not listed and propositions of law not cited, that the lower court was in error in rendering its decree of November 20, 1951. Accordingly, said decree is reversed and the cause remanded with directions to the trial court to dismiss the bill as amended and the cross bills as amended.

Reversed and remanded with directions.

### 6 Div. 489 (55708)

This is the cross-appeal taken by Mr. and Mrs. Lanier from the decree of November 20, 1951. On authority of Western Grain Co. v. Sterling S. Lanier, III, 6 Div. 374, supra, the said decree is reversed and the cause remanded with directions to the trial court to dismiss the bill as amended and the cross bills as amended.

Reversed and remanded with directions.

### 6 Div. 490 (55708)

This is the cross-appeal taken by Edward Wilkinson, Jr., individually, and as Executor of the will of Edward Wilkinson, deceased, and as Trustee thereunder, and as Trustee of the trusts represented by him, from the decree of November 20, 1951. On authority of Western Grain Co. v. Sterling S. Lanier, III, 6 Div. 374, supra, the said decree is reversed and the cause remanded with directions to the trial court to dismiss the bill as amended and the cross bills as amended.

Reversed and remanded with directions.

### 6 Div. 585 (55708)

This is the appeal taken by Bethea McCall, as co-trustee of the Marguerite W. Mudd and the Dimmis Wilkinson Riley living trusts, from the decree of November 20, 1951. On authority of Western Grain Co. v. Sterling S. Lanier, III, 6 Div. 374, supra, the said decree is reversed and the cause remanded with directions to the trial court to dismiss the bill as amended and the cross bills as amended.

Reversed and remanded with directions.

### 6 Div. 491 (53010)—6 Div. 492 (53010) —6 Div. 584 (53010)

In addition to the parts of the decree of the lower court discussed in 6 Div. 374, supra, rendered on November 20, 1951, there was included in that decree what is called the "proxy provision." A part of the court's finding is as follows:

"The Court is further of the opinion that the voting power of all of the trust shares should be unitized in accordance with the intent expressed in the several trust instruments and also in the interest of all of the trust estates and the beneficiaries thereunder. To this end the Court is of the opinion that all of the trustees of the several trusts, except the First National Bank of Birmingham, namely, Edward Wilkinson, Jr., Bethea McCall and Doak Mudd, should execute powers of attorney, designating the First National Bank of

Birmingham as their attorney in fact and proxy, to vote the shares of stock in the Western Grain Company, held by the respective trusts, at all stockholders' meetings until the further orders of this court."

This, with other orders in the decree, had the effect of placing control of Western Grain Company in the First National Bank of Birmingham. All of the parties affected by this proxy provision, except the Bank, appealed therefrom and petitioned in the alternative for mandamus.

6 Div. 491 is the appeal and petition of Edward Wilkinson, Jr., individually and in all of his representative capacities.

6 Div. 492 is the appeal and petition of Mr. and Mrs. Lanier.

6 Div. 584 is the appeal and petition of Mr. McCall and Dr. Doak Mudd, as co-trustees of the Dimmis Wilkinson Riley Trust.

On authority of Western Grain Co. v. Sterling S. Lanier, III, 6 Div. 374, supra, each of these appeals is dismissed and the petitions for mandamus are denied.

Appeals dismissed; writs denied.

### 6 Div. 657 (53010)

This is an appeal by Edward Wilkinson, Jr., as Co-Trustee and Co-Executor, from a decree dated August 22, 1947, and amended August 28, 1947, by which he was removed as Co-Trustee of certain of the living trusts; Mr. Bethea McCall was removed as Co-Trustee of some of the trusts and the First National Bank of Birmingham was appointed Co-Trustee of some of the trusts. The case was also submitted on petition for writ of mandamus in the alternative.

Mrs. Mudd, Mrs. Riley and Mr. McCall filed cross appeals and petitions for mandamus, which are docketed here as 6 Div. 658.

It will be remembered that all parties agreed to the appointment of Mr. Bethea McCall as Co-Executor and Co-Trustee with Edward Wilkinson, Jr., when Mrs. Lanier resigned pursuant to the settlement contained in the May 25, 1942, decree. In a proceeding known as the May 15th (1947) petition Mrs. Mudd and Mrs. Riley, as beneficiaries of three of the trusts created by their father, filed a petition seeking the removal of Edward Wilkinson, Jr., as Co-Trustee of each of said trusts.

Edward Wilkinson, Jr., individually and as Co-Trustee, had filed what is known as the June 20th (1944) petition seeking the removal of Mr. McCall as Co-Trustee if he had in fact been legally appointed.

The petitions of all parties having been amended, the court consolidated them, and after a hearing rendered the decree which is sought to be reviewed here and which reads as follows:

"This cause coming on to be heard, orally before the Court, pursuant to the decree of this Court heretofore entered on May 30, 1947, on the petitions of Marguerite Wilkinson Mudd and Dimmis Wilkinson Riley for the removal of Edward Wilkinson, Jr., as Co-Executor and Co-Trustee under the Will of Edward Wilkinson, Sr., and as Co-Trustee of the living trusts known as the Grace H. Wilkinson Trust, the Edward Wilkinson, Jr., Trust, the Elizabeth Wilkinson Lanier Trust, the Dimmis Wilkinson Riley Trust, and the Marguerite Wilkinson Mudd Trust, heretofore filed herein on March 29, 1946, as amended on June 17, 1946, and on June 3, 1947, and on the petition of Mrs. Dimmis Wilkinson Riley, Marguerite Wilkinson Mudd, J. P. (Doak) Mudd, Jr., Edward Wilkinson Mudd and Robert H. Mudd, heretofore filed herein on May 15, 1947, seeking a restraining order against Edward Wilkinson, Jr., and his removal in all of his above described fiduciary capacities except as Co-Trustee of the Edward Wilkinson, Jr., and the Elizabeth Wilkinson Lanier living trusts, and on that aspect of the petition of Edward Wilkinson, Jr., et al., heretofore filed herein on June 29, 1944, and as last amended, seeking the removal of Bethea McCall as Co-Executor and Co-Trustee under the Will of Edward Wilkinson, Sr., Deceased, and as Co-Trustee of the five (5) above named living trusts created by Edward Wilkinson, Sr., to the petition of

**168**

Dimmis Wilkinson Riley, et al., designated as the May 15, 1947, petition and on the answer of Bethea McCall to the petition of Edward Wilkinson, Jr., et als., known as the June 29, 1944, petition, as last amended, and on the testimony as noted; and all of the parties having appeared in open Court by and through their Solicitors of record; and the Court, having consolidated all of said petitions for hearing and decree and having heard the testimony of witnesses and examined the documentary evidence introduced and having heard argument of counsel, upon consideration thereof, is of the opinion that:

"1. The facts do not justify the removal of Edward Wilkinson, Jr., as Executor of the Will of Edward Wilkinson, Sr., Deceased.

"2. Extreme hostility exists between Edward Wilkinson, Jr., and Mrs. Mudd, certainly on the part of Mrs. Mudd, even if not to such a great extent on the part of Edward Wilkinson, Jr., and an irreconcilable and serious conflict of collateral interests exists, primarily in the struggle for voting control of the Western Grain Company, between Edward Wilkinson, Jr., on the one hand and Mrs. Mudd and Mrs. Riley on the other; and that, under the circumstances, Edward Wilkinson, Jr., should not remain as Trustee of the Marguerite Wilkinson Mudd or the Dimmis Wilkinson Riley living trusts, but should be removed as such Trustee.

"3. Mrs. Grace H. Wilkinson is the primary beneficiary of the testamentary trust and her guardian has not sought the removal of Edward Wilkinson, Jr., as its Trustee nor as Trustee of the Grace H. Wilkinson living trust, nor do the facts justify his removal as such Trustee.

"4. The facts do not justify the removal of Edward Wilkinson, Jr., as Trustee of the Edward Wilkinson, Jr., or the Elizabeth Wilkinson Lanier living trusts.

"5. The primary duty of the Court is to see that the estate of the decedent and the several trust estates be administered in the best interest of the beneficiaries of the trusts and that the said estates not be burdened with the expenses of litigation resulting from the conflicting views of Co-Trustees and Co-Executors and their respective attorneys. Bethea McCall reluctantly accepted the appointment as Co-Executor and Co-Trustee of the Will of Edward Wilkinson, Sr., Deceased, and as Co-Trustee of the five (5) living trusts at a time when he thought all litigation was at an end; that his capable management of the Western Grain Company has greatly benefited the trust estates, but the litigation in which he is involved has been very distasteful to him, and with the conflicts existing between the two factions, the Court believes that it is to the best interest of the trust estates that Mr. McCall be relieved of his fiduciary duties, except as Trustee of the Marguerite Wilkinson Mudd and the Dimmis Wilkinson Riley living trusts, so that he may devote his entire time and thought to the management of the Western Grain Company.

"It is, therefore, ordered, adjudged and decreed by the Court as follows:

"1. That the prayers seeking the removal of Edward Wilkinson, Jr., as Co-Executor and Co-Trustee under the Will of Edward Wilkinson, Sr., Deceased, be and the same are hereby denied;

"2. That the prayers seeking the removal of Edward Wilkinson, Jr., as Co-Trustee of the Edward Wilkinson, Jr., the Elizabeth Wilkinson Lanier, and the Grace H. Wilkinson living trusts be and the same are hereby denied;

"3. That the prayers seeking the removal of Edward Wilkinson, Jr., as Co-Trustee of the Dimmis Wilkinson Riley and the Marguerite Wilkinson Mudd living trusts be granted and he is hereby removed as such Co-Trustee, effective Thirty (30) days from the date of this decree.

"4. That the demurrer of Edward Wilkinson, Jr., to the May 15, 1947, petition of Dimmis Wilkinson Riley, et als., be and the same is hereby overruled;

"5. That the prayer seeking the removal of Bethea McCall as Co-Trustee of the

Dimmis Wilkinson Riley and the Marguerite Wilkinson Mudd Trusts be and the same is hereby denied;

"6. That the prayers seeking the removal of Bethea McCall as Co-Executor of and Co-Trustee under the Will of Edward Wilkinson, Sr., Deceased, and as Co-Trustee of the Edward Wilkinson, Jr., and the Elizabeth Wilkinson Lanier, and the Grace H. Wilkinson Trusts be granted and he is hereby removed as such Co-Executor and as Co-Trustee of each of said trusts, effective thirty (30) days from date of this decree;

"7. That the said Edward Wilkinson, Jr., and the said Bethea McCall be and they are hereby directed to file final settlements of their accounts in each fiduciary capacity in which they have been removed within sixty (60) days from the date of this decree;

"8. That the First National Bank of Birmingham is hereby appointed as Co-Executor and Co-Trustee under the Will of Edward Wilkinson, Sr., deceased, and as Co-Trustee of the Grace H. Wilkinson living Trust. The appointment of Co-Trustees under the remaining four (4) living trusts is reserved for the further orders of the Court;

"9. That neither Edward Wilkinson, Jr., nor Bethea McCall shall in their respective fiduciary capacities dispose of or contract for the sale of any of the property in the respective trusts or vote any of the stock in said trust estates pending the appointment, acceptance and qualification of successor Co-Trustees and a successor Co-Executor;

"10. That that aspect of the petition of Dimmis Wilkinson Riley, et al., of May 15, 1947, seeking a restraining order against Edward Wilkinson, Jr., in his several fiduciary capacities, is reserved for further hearing and order of this Court;

"11. That the Court costs of this proceeding be and the same are hereby taxed against the estate of Edward Wilkinson, Sr., Deceased, for which let execution issue.

"Done and ordered this, the 22nd day of August, 1947,

"Eugene H. Hawkins,
Circuit Judge, in Equity Sitting."

We dismiss the appeal in this cause on the authority of Ex parte Jonas, 186 Ala. 567, 64 So. 960, 964, where it was held that no appeal would lie from the order of removal of a trustee, but "for an abuse of judicial discretion, it is recognized that mandamus is the proper remedy, and will lie, to compel a proper exercise thereof." See also Brewer v. Brewer, 250 Ala. 658, 35 So.2d 557. We said in Ingalls v. Ingalls, 257 Ala. 521, 59 So.2d 898, 903:

"While the removal of a trustee is a matter resting largely within the sound judicial discretion of the trial court, it is equally clear that an abuse of that discretion renders its exercise subject to review. Ex parte Jonas, supra [186 Ala. 567, 64 So. 960]; In re Crawford's Estate, supra [340 Pa. 187, 16 A.2d 521]. See Scott on Trusts, § 107.

"In so far as the decree of the trial court is sought to be reversed on the ground that the evidence is insufficient to support the decree removing appellants as trustees of the several trusts, our review here is governed by the following principles: First, since the exercise of the function of removing trustees by a court of equity belongs to what is called that court's sound judicial discretion, its action in removing appellants will not be reversed unless we are convinced that such discretion has been abused. Ex parte Jonas, supra. Second, where, as here the evidence was taken *ore tenus*, or partly so, the trial court's conclusion on the facts will not be disturbed unless palpably wrong. Aiken v. Barnes, 247 Ala. 657, 25 So.2d 849, and cases cited."

As previously stated, the case is here on petition for mandamus and we now proceed to consider the petition.

Appellant states in brief that the issues in so far as 6 Div. 657 is concerned, are:

"1. Edward Wilkinson, Jr., should not have been removed as trustee of the Riley Trust;

"2. Edward Wilkinson, Jr., should not have been removed as trustee of the Mudd Trust;

"3. Mr. McCall should have been removed as trustee of the Riley Trust;

"4. Mr. McCall should have been removed as trustee of the Mudd Trust;

"5. The Bank should not have been appointed as executor of the will of the decedent; and

"6. The Bank should not have been appointed as trustee under said will or as trustee of the Wilkinson Trust."

 We quote again from Ingalls v. Ingalls, supra:

"It has long been recognized that courts of equity having supervision over administration of trusts have the power to remove a trustee for proper cause. This power is not dependent upon statute and it has been held generally that what constitutes a sufficient ground for removal is within the sound judicial discretion of the court.

"In this state we have a statute which provides that upon the petition or bill of any person interested in the execution of a trust, a court of equity may remove a trustee who has violated or threatened to violate the trust, or who is insolvent or whose insolvency there is good reason to apprehend, or who has removed from the state, or who for any other cause is an unsuitable person to execute the trust, or who has any pecuniary interest which may be adverse to the interest of the trust. Title 58, § 65, Code 1940. While this statute enumerates some specific grounds for removal, it also contains the omnibus provision, 'or who, for any other cause, is an unsuitable person to execute the trust'. So our statute is not a limitation upon the power of a court of equity in the matter of removal of trustees, but is in effect a declaration of the law as it existed. Ex parte Jonas, 186 Ala. 567, 64 So. 960."

Upon a consideration of the evidence we are in accord with the conclusions reached by the court in the decree, supra. We do not think the court abused its discretion in taking the action outlined in its decree and it follows that the petition for mandamus must be denied.

Appeal dismissed and writ denied.

### 6 Div. 658 (53010)

This is the appeal and petition for mandamus of Mrs. Mudd, Mrs. Riley and Mr. McCall objecting to the removal of Mr. McCall and further objecting that Edward Wilkinson, Jr., was not removed as cotrustee from all the trusts.

The appeal is dismissed and the petition for mandamus is denied in this case on authority of Wilkinson v. Riley, 6 Div. 657.

Appeal dismissed and writ denied.

### 6 Div. 143 (53010)—6 Div. 144 (53010)

The two appeals, with a prayer for alternative writ of mandamus in each case, involved in cases numbered 6 Div. 143 (53010) and 6 Div. 144 (53010), are from two decrees entered on March 20, 1950.

The decree in 6 Div. 143 appointed Dr. Doak Mudd, son of Mr. and Mrs. Mudd, as successor cotrustee of the trust in which Mrs. Mudd was beneficiary, and the decree in 6 Div. 144 appointed him successor cotrustee of the trust in which Mrs. Riley was beneficiary.

The last sentence of paragraph numbered 8 in the decree of the court set out in 6 Div. 657, supra, reads: "The appointment of cotrustees under the remaining four (4) living trusts is reserved for further orders of the court." Pursuant to this reservation, the court appointed Dr. Mudd to succeed Edward Wilkinson, Jr., as cotrustee of these two trusts.

After the rendition of the decree of August 22, 1947, in 6 Div. 657, supra, the

trustee personnel of the trusts and shares involved were:

| | Shares |
|---|---|
| (1) Testamentary trust under will— Trustees Edward Wilkinson, Jr., and First National Bank of Birmingham | 151 |
| (2) Grace H. Wilkinson trust— Trustees Edward Wilkinson, Jr., and First National Bank of Birmingham | 30 |
| (3) Edward Wilkinson, Jr., living trust— Trustee Edward Wilkinson, Jr. | 20 |
| (4) Elizabeth W. Lanier, living trust— Trustee Edward Wilkinson, Jr. | 20 |
| (5) Mrs. Dimmis W. Riley, living trust— Trustee Bethea McCall | 30 |
| (6) Mrs. Marguerite W. Mudd, living trust— Trustee Bethea McCall | 20 |
| | 271 |

The decree in the instant cases provided all the trusts with cotrustees except (3) and (4) of whom Edward Wilkinson, Jr., remained sole trustee.

Appellants, Edward Wilkinson, Jr., and Mrs. Lanier, concede that these cases are dependent, in part, for decision on the outcome of 6 Div. 657.

The court could have appointed Dr. Mudd at the same time the First National Bank was appointed cotrustee of the testamentary trust and the Grace Wilkinson trust. The mere fact that it waited until later to appoint him is immaterial. Having refused to hold that the court abused its discretion in removing and appointing the trustees in 6 Div. 657, supra, we reach the same conclusion in these cases respecting the appointment of Dr. Mudd.

Appeal dismissed in each case and petition for mandamus denied in each case.

6 Div. 694 (53010) and 6 Div. 966 (53010)

6 Div. 694 (53010) is an appeal by Edward Wilkinson, Jr., individually and as Co-Trustee and Co-Executor, from a decree sustaining the demurrer to the June 29th (1944) petition as amended. The cause was also submitted on petition for mandamus, which is 6 Div. 966 (53010), praying that the trial court be commanded to show cause why the decree "should not be reversed, vacated and annulled." The decree overruled the motion to strike the June 29th (1944) petition for prolixity but sustained the demurrer to the petition on the ground of multifariousness. Edward Wilkinson, Jr., individually and in his various representative capacities, was allowed to intervene to show cause why the petition should not be stricken for prolixity.

Ordinarily we would not entertain a petition for mandamus to review a ruling of the trial court on a motion to strike for prolixity but in the instant case the case is here on appeal from a decree sustaining the demurrer to the bill. We think it would promote justice to express our views on the question of prolixity presented by the petition for mandamus. Ex parte Morton, 261 Ala. 581, 75 So.2d 500.

The trial court in its decree stated that it regarded the petition as being prolix but sustained the demurrer to the petition on the ground of multifariousness in order to expedite the trial of the cause. Upon consideration by the entire court we are of the opinion that the petition should be stricken for prolixity.

The petition amended a number of times is more or less a running account of much that has transpired in the entire litigation between the stockholders and directors of Western Grain Company, the administration of the estate of Edward Wilkinson, Sr., and the administration of the trusts. It contains complaints against many and divers respondents. It consists of various independent bases for relief. It contains over eighty prayers for relief and it consists of several phases of this entire con-

troversy which is the subject of separate appeals. The June 29th petition and the various amendments together cover 349 pages of transcript paper in four different volumes of the master record.

Accordingly we grant the application for mandamus and direct the court to strike the petition as prolix. We take into consideration the fact that the court regards it as prolix. Since the petition will be stricken under the aforesaid ruling, the appeal is functus officio and has no further purpose.

The appeal in 6 Div. 694 (53010) is, accordingly, dismissed.

Application for mandamus granted and appeal dismissed.

### 6 Div. 689 (53010)

This is an appeal from a decree rendered on December 24, 1947, denying certain temporary injunctions sought by Edward Wilkinson, Jr., individually and in his capacities as executor of the will of Edward Wilkinson, deceased, and as trustee thereunder and as trustee of the Grace H. Wilkinson trust, the Elizabeth W. Lanier trust and the Edward Wilkinson, Jr., trust. These matters were contained in the June 29th (1944) petition. The court was asked to enjoin and restrain,

"1. Western Grain Company, its directors, officers and employees, from paying any compensation to J. P. Mudd for any services heretofore or hereafter rendered or claimed to be rendered except fees for attendance at directors' meetings and except fair and reasonable compensation for strictly legal services unless and until payment for same shall have been duly authorized by the Board of Directors of said corporation;

"2. Western Grain Company, its directors, officers and employees, from paying or authorizing the payment of any compensation to J. P. Mudd for acting as an officer or employee of said corporation except as Director or attorney for it with respect to directors' fees for attendance at

meetings duly held or strictly legal services actually rendered;

"3. Western Grain Company, its directors, officers and employees, from paying, and said J. P. Mudd from receiving, any compensation for services as attorney for the company in respect of the litigation involved in this cause, or in cause No. 55,708, and No. 63,471, rendered after May 25, 1947, unless and until the same shall have been authorized and fixed by a Board of Directors of said Company duly elected;

"4. Western Grain Company, its directors, officers, agents and employees from paying dividends on its outstanding preferred stock held by said J. P. Mudd, Marguerite W. Mudd, Eula W. Cross, E. T. Rice, E. W. Riley, and H. R. Terry, or by such thereof as the Court shall deem proper with respect to time elapsed after May 25, 1947, or such later date as the Court shall see fit to fix as the reasonable time within which redemption thereof should have been effected."

After a hearing the court found as follows:

"Pursuant to agreement of the parties, said applications were set down for hearing as contemplated by Section 1054, of Title 7, of the Code of Alabama of 1940 and came on to be heard on this day. Said applications were submitted for the petitioner on the petition filed by him in the above entitled cause on June 29, 1944, as amended by Amendments Nos. One to Eight, inclusive, and on the affidavit of Lee C. Bradley, Jr., verified on December 23, 1947, and for the various respondents thereto on said petition and amendments thereto. After consideration, the Court being of the opinion that the said J. P. Mudd and other parties to whom dividends on the preferred stock might be paid were solvent, and there was no allegation to the contrary, deems that there was no reason for the issue of the temporary injunctions prayed for."

The court then rendered its decree denying the applications for temporary injunctions.

Pretermitting the question of whether an appeal will lie, we apply the rule as set out in Slay v. Hess, 252 Ala. 455, 458, 41 So.2d 582, 584, where the court said:

"In passing on the application for the issuance of an injunction pendente lite, the trial court is invested with a wise judicial discretion and has the right to consider and weigh the relative degree of injury or benefit to the respective parties, and where such discretion is not abused the order of the circuit court will not be disturbed. Jones et al. v. Jefferson County et al., 203 Ala. 137, 82 So. 167; Holcomb et al. v. Forsyth, 216 Ala. 486, 113 So. 516; Boatwright et al. v. Town of Leighton et al., 231 Ala. 607, 166 So. 418."

See, also, McLean v. Church of God, 254 Ala. 134, 138, 47 So.2d 257; Lukes v. Alabama Power Co., 257 Ala. 590, 592, 60 So. 2d 349; Corte v. State, 259 Ala. 536, 542, 67 So.2d 782.

We do not think the trial court abused its discretion in denying the applications for temporary injunctions and it follows that the decree should be affirmed.

Affirmed.

### 6 Div. 892 (53010)

This is an appeal from a decree of the circuit court granting motions to quash a rule nisi and dismissing as to each of four separate respondents, a petition which is referred to as the "contempt petition." It was filed by Edward Wilkinson, Jr., in his capacity as Executor.

The respondents to the contempt petition are Mr. McCall, Mrs. Mudd, Mr. Mudd and their attorney, Judge Horace Wilkinson. The contempt complained of is the execution of the instrument known as the Mudd-McCall Contract which was under consideration by this court in Riley v. Wilkinson, 247 Ala. 579, 25 So.2d 384, 390, when the cause was here on appeal from a decree overruling the demurrer. The facts are set out fully in that opinion and will only be sketched briefly here.

In 1943 the Government entered a deficiency estate tax assessment for some $52,000 against the Estate of Edward Wilkinson, Sr., deceased. On October 16, 1943, a petition was filed by the coexecutors asking for instructions as to how to meet the payment of the deficiency assessment.

On January 20, 1944, the court entered a final decree which provided a plan for raising the money to meet the payment of the assessment through the sale of common stock of the Western Grain Company belonging to the estate, and enjoined disposition of the stock on a basis at variance with the decree. A supersedeas appeal was taken on January 20 and on January 21, 1944, Mrs. Mudd and Mr. McCall entered into the contract which it is claimed put them, Mr. Mudd and Judge Wilkinson in contempt. In the case of Riley v. Wilkinson, supra, this court held:

"The contract of January 21, 1944, between McCall and Mrs. Mudd is violative of the prohibitory injunction of January 20, 1944, and must be set aside and held for naught."

When the present contempt petition came on to be heard the trial court found, in part, as follows:

"1. That this is a civil contempt proceeding, and that if a contempt of this Court was committed, said Defendants, Horace C. Wilkinson, J. P. Mudd and Mrs. Marguerite W. Mudd, could not be punished as and for a civil contempt because they were not enjoined by the Decree of January 20, 1944;

"2. If a contempt of this Court was committed and even if the four named defendants could be punished as and for a civil contempt they could be punished only if it is shown that the estate of Edward Wilkinson, Sr., Deceased, or one or more of the beneficiaries of his testamentary trust estate suffered some loss or damage by reason of the act complained of:

"3. That the only loss complained of is that the Petitioner herein has incurred some liability for attorneys' fees in connection with the proceedings on the petition filed by the Petitioner herein on February 5, 1944, and/or in connection with this petition, as last amended, filed on November 15, 1944, in order to have the so-called 'Mudd-McCall Contract' judicially declared to be a nullity, or in order to bring about its rescission by the parties thereto:

"4. That in addition to the fact that the said contract has been declared by this Court to be null and void as violating the Decree of this Court of January 20, 1944, it is obvious that it could never have had any force or effect unless joined in by Edward Wilkinson, Jr., as Co-Executor and Co-Trustee of the estate of Edward Wilkinson, Sr., Deceased, or unless upon proper application to this Court, Edward Wilkinson, Jr., in such capacities, had been directed to join in its execution or to execute a transfer of the shares of stock described therein to Mrs. Mudd, because of the Decree of this Court of November 16, which is in full force and effect;

"5. That in view of the above, the petition of February 5, 1944, and this proceeding with reference to contempt were unnecessary to protect the Estate of Edward Wilkinson, Sr., Deceased, or the beneficiaries of his testamentary trust estate;

"6. That the Petitioner herein cannot voluntarily incur a liability not made necessary by the act complained of and thereupon seek to have these defendants punished as and for a civil contempt based solely upon such voluntarily incurred liability; * * *"

The contempt petition was dismissed and the costs taxed against Edward Wilkinson, Jr., individually.

We are asked to review this action of the court both by appeal and by alternative writ of mandamus. We quote the following from appellant's brief:

"After the final decision of this Court in Riley v. Wilkinson (247 Ala. [579], [25 So.2d 384]), the Mudd-McCall contract was rescinded by Mrs. Mudd and Mr. McCall. Thenceforth, there was no occasion to prosecute the contempt petition in order to secure that result. It was desirable, however, to continue to prosecute the petition for · the purpose of inducing the courts of this state to hold that any of the respondents guilty of contempt should be required to pay the expenses involved in attempting to remedy the damage caused by the execution of that contract. Essentially, that damage resulted from the expenses incurred in filing and prosecuting the February 5, petition to effect and defending the January 20 decree in this Court."

The concluding paragraph of the Mudd-McCall contract is as follows:

"The undersigned (Bethea McCall as one of the executors of the Estate of Edward Wilkinson, Deceased), makes the sale herein referred to and executes and delivers this instrument on the following conditions: That he has the legal right and authority as one of the executors of the estate of Edward Wilkinson, Sr., deceased, to lawfully sell, assign, transfer and set over said stock or the interest of the estate of Edward Wilkinson, Sr., deceased, therein at this time, and should the said Bethea McCall, as such executor not have the legal right and lawful authority so to do at this time, then this instrument shall be construed so as to transfer, sell, assign and set over said stock to Mrs. Marguerite Mudd on the terms and conditions named herein as soon as the said Bethea McCall, as such executor, shall possess the legal right and lawful authority so to do."

It is clear that the contract was made subject to the condition that Mr. McCall had the legal authority and right to make it, and as the circuit court found in paragraph 4, supra, it could never have had any force or effect unless joined in by Edward Wilkinson, Jr., or the court should, upon proper application direct him to execute the contract as the co-executor of the estate under the decree of November 16, 1942. (It should be noted that the matters with which we are concerned in the instant case occurred prior to August 22, 1947, when Mr. McCall was removed as Co-Executor.)

The two pertinent paragraphs of the decree of November 16, 1942, are:

"IX. In the administration of the estate of Edward Wilkinson, Sr., deceased, the assent and concurrence of both of the co-executors shall be and is hereby made necessary to the validity of any action taken by the co-executors in the administration of the trusts created by the last will and testament of Edward Wilkinson, Sr., deceased, and in the administration of the five separate trusts above named. The assent and concurrence of both of the co-trustees shall be and is hereby made necessary and essential to the validity of any action as trustees.

\* \* \* \* \* \*

"XI. In the event the co-executors of the estate of Edward Wilkinson, Sr., deceased, or the co-trustees of the several trusts above named are unable to agree upon a decision as to any matter proper for their consideration, either or both of them may apply to the Court at any time for instruction regarding such matter. This shall apply to the employment of counsel and to all other matters proper for the consideration of or action by said executors and trustees."

We are in accord with the decree of the lower court dismissing the petition and taxing the costs, and it follows that the decree should be affirmed and the petition for mandamus denied.

Affirmed; writ denied.

### 6 Div. 893 (53010)

This appeal and the petition for an alternate writ of mandamus are brought to review a decree rendered September 28, 1948, amended in certain formal respects on October 26, 1948.

The entry of the decree appealed from grows out of the following circumstances: Edward Wilkinson, Jr., as a co-executor of the estate of his deceased father, filed the instrument which we have heretofore characterized as the June 29 petition. See

6 Div. 694 and 6 Div. 966, this day decided. Among many other prayers of the petition was one to the effect that Mr. Wilkinson, Jr., be given certain instructions with respect to transferring to his sister, Mrs. Lanier, thirty-four shares of stock of Western Grain Company. It was alleged that Mrs. Lanier had bought the thirty-four shares of stock at a sale for taxes held by the Internal Revenue Department and that Mr. Wilkinson, Jr., in his representative capacity, had joined in that sale. Mr. Wilkinson, Jr., asked the court to approve title to the stock in Mrs. Lanier and to approve his action with respect to joining in the sale.

The sale of the thirty-four shares of stock has been involved in other litigation before this court. See Riley v. Wilkinson, 247 Ala. 231, 23 So.2d 582, and Riley v. Wilkinson, 247 Ala. 579, 25 So.2d 384, for a more detailed treatment of the facts concerning this transaction.

In 6 Div. 694 it is shown that the trial court sustained demurrer to the instrument filed June 29, 1944, on the ground that it was multifarious, but such action was not taken until after that aspect or phase of the instrument concerning the thirty-four shares of stock had been severed by the trial court, such action evidently being taken under the provisions of Equity Rule 15.

Mrs. Lanier, one of the persons named as a party respondent to the instrument filed June 29, 1944, after the order of severance had been made, filed what counsel describes as a cross-bill to that part which had been severed. The trial court dismissed Mrs. Lanier's so-called cross-bill after sustaining demurrer to it on the ground that "Mrs. Lanier can obtain whatever relief she is entitled to under certain aspects of the June 29 petition and her answer thereto." It is this decree which is here sought to be reviewed, not any ruling or decree relating to the so-called June 29 petition. This was a final decree whether that pleading be called a cross-bill or cross-petition and is sufficient to support an appeal. Hartford Accident & Indemnity Co. v. Green, 223 Ala. 96, 134 So. 487.

Although the decree was final so as to allow six months in which to appeal, Mrs. Lanier failed to perfect her appeal within that period of time. The appeal was taken on April 26, 1949, more than six months after September 28, 1948, the day on which the decree was rendered dismissing Mrs. Lanier's so-called cross-bill. True, the trial court amended the decree *ex mero motu* on October 26, 1948, but the amendment was not one of substance but was one to correct a mere clerical error apparent on the face of the original decree. In our recent case of Sadler v. Sessions, 261 Ala. 323, 74 So.2d 425, 427, we approved the rule that "the day on which the judgment was rendered, and not the day on which the judgment entry was amended, the amendment not changing the character of the judgment, is the time from which the limitation begins to run."

The time of appeal is jurisdictional and it follows, therefore, that the appeal must be dismissed.

Appeal dismissed. Writ of mandamus denied.

All the Justices concur in the foregoing decisions, except MAYFIELD, J., not sitting.

On Further Motion for Rehearing

6 Div. 893 (53010).

 The judgment on the original application for rehearing filed by appellant was entered during the present term of this court, and, therefore, we have the right to order the case placed on our rehearing docket for further consideration. Kinney v. Pollak, 225 Ala. 229, 142 So. 390. It has been so ordered and upon such a rehearing and further consideration, we are of the opinion that we were in error in holding that the decree of September 28, 1948 was a final decree, and we now hold that such decree is of the kind from which an appeal could have been taken to this court within thirty days from its rendition. Sec. 755, Title 7, Code 1940; Nearhos v. City of Mobile, 257 Ala. 161, 57 So.2d 819, and cases cited.

As shown in the original opinion, the appeal was not taken until April 26, 1949, much more than thirty days after the date on which the decree was rendered; hence our former judgment should not be disturbed for the appeal came much too late and therefore is subject to dismissal by the court ex mero motu. Since a timely appeal could have been maintained, the petition for alternative writ of mandamus is due to be denied.

Our former opinion is modified as above indicated, and as so modified, the rehearing is overruled.

All the Justices concur except MAYFIELD, J., who was not a member of the court on original submission.